UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL BLOOMFIELD,

                  Plaintiff,

        - against -

ALVEST SAS, ALVEST (USA), INC., and
SAGE PARTS PLUS, INC. d/b/a SAGE PARTS,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

23-cv-5090

COMPLAINT

PLAINTIFF DEMANDS A
TRIAL BY JURY

Plaintiff Michael Bloomfield ("Bloomfield" or "plaintiff") by his attorneys, Vladeck, Raskin & Clark, P.C., complains of defendants Alvest SAS ("Alvest SAS"); Alvest (USA), Inc. ("Alvest (USA)") (collectively Alvest entities are referred to herein as "Alvest defendants" or "Alvest"); and Sage Parts Plus, Inc. d/b/a Sage Parts ("Sage") (collectively Sage with Alvest defendants are referred to herein as "defendants") as follows:

NATURE OF CLAIMS

1.    For over four decades, Bloomfield, a 68-year-old executive, had a successful career in the aviation industry, including cofounding Sage, a supplier of replacement parts for aviation ground support equipment, and, after selling the business to Alvest, serving as Sage's Executive Vice President for more than 13 years.

2.    Bloomfield's long tenure and important contributions, however, did not save him from defendants' discrimination. As Bloomfield got older, Alvest's top executives marginalized and punished Bloomfield by demoting him, taking away his responsibilities, and slashing his compensation. Making no effort to hide defendants' unlawful motivations, former Chief Executive Officer ("CEO") and current Chairman of the Board Jean-Marie Falconis

1295917 v1

("Falconis") and its current CEO Antoine Maguin ("Maguin") made repeated age biased comments. When telling Bloomfield that defendants were cutting his compensation and imposing other unfavorable employment terms, Falconis admitted that defendants were looking for a "replacement" "in his late 30s [or] early 40s" who could be the "guy of the future"; that his ideal hire was someone who was "20 years younger than [Bloomfield]"; and that the Company had to "invest in [a] new person" for the "future."

3.    Defendants were similarly unambiguous when they fired Bloomfield. Maguin, in explaining the reason for doing so, conceded that he wanted to "transition and build a team for the future," which would not include Bloomfield despite his untarnished record and decades with the Company.

4.    Defendants' discrimination against Bloomfield was far from an isolated incident. In flagrant violation of the anti-discrimination laws, Falconis and Maguin repeatedly stated that they wanted to get rid of older managers to make way for a "new generation" of younger employees and to hire a "younger team."  Consistent with this scheme, Falconis and Maguin pushed out several high-level managers of Alvest companies and replaced them with younger, less experienced employees.

5.    Bloomfield brings this action to remedy age discrimination and retaliation in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA").

6.    Bloomfield also brings this action to remedy discrimination and retaliation in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ("State Law").

2

1295917 v1

7.      Bloomfield seeks injunctive and declaratory relief, lost wages and benefits, compensatory, liquidated and punitive damages, and all other appropriate equitable and legal relief pursuant to the ADEA and the State Law.

## JURISDICTION AND VENUE

8.      Jurisdiction of this Court is proper under 28 U.S.C. § 1331 because plaintiff has brought claims pursuant to the ADEA.

9.      This Court has supplemental jurisdiction over plaintiff's State Law claims pursuant to 28 U.S.C. § 1367 because these claims closely relate to his ADEA claims, having arisen out of a common nucleus of operative facts, such that all claims form part of the same case or controversy.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Sage is headquartered in Melville, New York and because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of New York.

11.     On April 26, 2022, Bloomfield filed a charge against defendants alleging age discrimination with the United States Equal Opportunity Employment Commission (the "EEOC"). On or about April 6, 2023, the EEOC issued plaintiff a notice informing him of the right to sue under the ADEA.

## PARTIES

12.     Bloomfield is a resident of the State of New York. He founded Sage and worked there for more than 20 years before Alvest unlawfully fired him.

13.     Alvest SAS is a French holding company that owns several firms throughout the world.

3

1295917 v1

14.     Alvest (USA), Alvest SAS's subsidiary, acquired Sage in 2008.  Alvest (USA) is a Delaware incorporation.  Alvest SAS wholly owns and operates Alvest (USA).

15.     Sage is a supplier of replacement parts for aviation ground support equipment, which Bloomfield cofounded.  As set forth above, Alvest (USA) acquired Sage in 2008. Sage, a Delaware corporation, is headquartered in Melville, New York.

FACTUAL ALLEGATIONS

Background

16.     Bloomfield is 68 years old. He is an executive with over four decades of experience in the aviation industry.

17.     Bloomfield earned two bachelor's degrees, including in mechanical/automotive engineering and in business marketing, both from Western Michigan University.

18.     At the beginning of Bloomfield's career, he worked for several companies in the aviation industry in various roles, including as an engineer, as a salesperson, and as a customer support leader.

19.     In or around 1997, Bloomfield and Mark Pollack ("Pollack"), who is approximately 15 years younger than Bloomfield, cofounded Sage. They divided the responsibilities of Sage between them. Under this arrangement, Bloomfield was responsible for revenue management and generation, sales, marketing, customer service, engineering, and quality control.

20.     With Pollack and Bloomfield leading the Company, Sage experienced exponential growth. Around the time they founded the Company, in or around 1997, Sage had less

4

than $2 million in annual revenue. By 2008, Bloomfield and Pollack had grown the Company's revenue to nearly $100 million annually.

21.    Among other contributions, Bloomfield was responsible for significant technological innovation while co-leading Sage. He created the engineering group, which studied the design flaws of the most frequently ordered replacement parts and developed enhanced and improved versions of those parts. This led to the launch of "Ramptech," Sage's own successful line of products that Bloomfield oversaw. In addition, Bloomfield oversaw the creation and sales of the Sage safety rail system, which is now installed on equipment throughout North America and led to significant additional revenue for Sage.

<u>Alvest Acquires Sage</u>

22.    Due to the financial crisis of 2008 and its effect on the airline industry, Bloomfield and Pollack determined that Sage required additional funding.

23.    Around that time, TLD Group ("TLD"), an Alvest-owned manufacturer of aviation ground support equipment, offered to acquire Sage. As part of the acquisition, Sage Parts Holding Inc. was established to acquire ownership of Sage. Sage Parts Holding Inc. then merged into Alvest (USA), a subsidiary of French holding company Alvest SAS, in 2008. As a result, Alvest became Sage's owner.

24.    Alvest SAS, Alvest (USA), and Sage were, and remain, closely related entities. For example, and without limitation:

a.    Alvest (USA) is a subsidiary of Alvest SAS. Alvest SAS wholly owns and operates Alvest (USA);

b.    Alvest (USA) wholly owns and operates Sage;

5

c. Since Alvest's acquisition of Sage in 2008, several Alvest executives, including Falconis, have served on Sage's Board of Directors;

d. Alvest executives, through Pollack, oversaw Sage's operations and employees. For example, Sage's CEO Pollack reported to Falconis during the time Falconis served as CEO of Alvest. As described in more detail below, Alvest executives also had authority to, and did make, hiring and firing decisions for Sage, including sometimes directing Pollack to hire or fire employees; and

e. Alvest has provided significant funding to Sage.

25. After the 2008 acquisition, Bloomfield and Pollack became Alvest employees. At that time, defendants appointed Bloomfield Executive Vice President of Sage and named Pollack President and CEO of Sage. Under this structure, Bloomfield reported to Pollack, and Pollack reported to Falconis, then-CEO of Alvest.

26. Bloomfield's duties after the acquisition remained the same as they had been during the period that he and Pollack independently owned Sage. Accordingly, after 2008, Bloomfield continued to be responsible for revenue management and generation, sales, marketing, customer service, engineering, and quality control.

27. After the acquisition, under Bloomfield and Pollack's continued leadership, Sage grew and was profitable. Sage's success during that time was driven in large part by a "single source" sales model that Bloomfield and Pollack adopted and refined. Under that model, Sage employees worked in-house at airline facilities to maintain inventory and sell and dispense customer parts as needed; this model eliminated the need for customers to maintain their own inventory of replacement parts. Under the single-source supply sales model, Sage's sales surged.

1295917 v1

28.     Bloomfield also continued to increase the sales for and improve the technology of Ramptech, Sage's own line of products, which established Sage as a high-quality provider.

29.     In addition, Bloomfield helped Sage overcome significant business challenges. For example, in or around 2015, Sage lost the business of Delta Air Lines, one of its largest customers, following failed negotiations that Bloomfield did not handle. After the negotiations failed, Bloomfield, who was responsible for sales and revenue, made it a priority to make up for the loss. He travelled extensively to solicit new business and expand Sage's contracts with preexisting customers.

30.     Bloomfield was able to secure revenue to replace Delta Air Line's business. This was a significant accomplishment that received recognition from Falconis during sales meetings and Executive Committee meetings.

31.     For the most part, Bloomfield consistently received positive performance feedback from his managers, including Alvest executives. Alvest also increased Bloomfield's salary most years from 2009 to 2017.

32.     Bloomfield's employment with Alvest was subject to a renewable employment agreement. Accordingly, due to his success at Sage, Alvest renewed Bloomfield's agreement every two years starting with the first renewal in 2010 to the last two-year renewal in 2018.

### Alvest Pushes Out Older Managers in Favor of Younger Employees

33.     Throughout Bloomfield's time at Sage, and in particular, since the mid-2010s, Alvest executives repeatedly made disparaging comments about Alvest's older managers.

7

1295917 v1

34.     As Sage's Executive Vice President, Bloomfield was a member of Alvest's Executive Committee. During Bloomfield's tenure, the Executive Committee was comprised of approximately 20 executives at Alvest and other Alvest-owned companies, including former CEO Falconis and current CEO Maguin.

35.     At many of the Executive Committee meetings Bloomfield attended, Falconis or Maguin stated they wanted to "transition" Alvest management to the "next generation" or to a "younger team."

36.     Falconis and Maguin put their desire to "transition" Alvest to a younger workforce into practice.

37.     For example, in or around 2016, Alvest began pressuring Bloomfield to replace the Director of Sales for Sage, who was at the time in his early 60s. Despite his highly successful tenure as a sales director, Alvest forced Bloomfield to demote the Director of Sales and replace him with a younger, less-experienced manager.

38.     When the replacement manager proved unsuccessful in the role, Bloomfield attempted to return the former Director of Sales to his prior job. Alvest blocked him from doing so. Pollack told Bloomfield, in sum and substance, "I'm told we need to find a younger team."

39.     In addition, on information and belief, Alvest management repeatedly instructed Pollack to direct Bloomfield to fire a Product Manager Tire Specialist at Sage, who was in his late 60s, and replace him with a younger manager. The Product Manager Tire Specialist is an expert in his field and, during Bloomfield's tenure, had no performance issues that would justify dismissal. In or around 2023, Alvest dismissed the Product Manager Tire Specialist.

40.     Also, Alvest prevented the Director of Product Management, who was then approaching 60 years old, from investing in the Company during an equity event. Even though the

8

Director of Product Management is a former investor, Alvest did not invite him to participate in purchasing new shares. When the Director of Product Management asked why Alvest did not invite him to invest, Pollack told him Alvest wanted to use the investment opportunities to recruit younger managers.

41.     In addition, on information and belief, Alvest asked the former Executive Vice President of TLD (an Alvest-owned manufacturer of aviation ground support equipment) who is in his mid-60s, to step down. He was replaced by a much younger employee.

42.     The pattern of replacing older managers with younger employees is evident in the demographics of Alvest's top echelons. For example, as of 2022, of the 20 Alvest executives and directors listed on the website, on information and belief, only two were in their 60s.

43.     Similarly, Alvest has ensured that there are only a few Sage management employees who are over 60.  As of 2022, on information and belief, of the 39 Sage employees at a management level or higher, approximately five were over 60. That included the Director of Sales, the Product Manager Tire Specialist, and the Director of Product Management, all of whom Alvest marginalized or reduced their roles in recent years. Indeed, since 2022, Alvest has dismissed the Product Manager Tire Specialist and the Director of Product Management has retired.  Also, the five employees included Sage's former Chief Financial Officer ("CFO") and Head of Human Resources ("HR"), who then worked on a part-time basis and who has since retired.

Alvest Targets Bloomfield

44.     Consistent with this pattern, as Bloomfield got older, Alvest started to push him to retire. In or around 2017, when Bloomfield was 62, Alvest declined initially to invite him to invest in the Company during an equity event.

9

1295917 v1

45.     When Bloomfield objected to Pollack, Pollack responded that, according to Falconis, Alvest planned to invite Bloomfield to invest later as an "S-Class" member. The "S" in "S-Class," on information and belief, refers to senior.  On information and belief, the group of employees included in the "S-Class" was entirely made up of employees who were in their 60s who had stated their intentions to retire.

46.     Bloomfield asked Pollack why he had been included in the "S-Class." Bloomfield stated he had no near-term intention of retiring. Pollack responded that Alvest had not discussed his departure with Pollack.

47.     On information and belief, Bloomfield was included in the "S-Class" because of his age and because of Alvest's assumptions about his intention to retire.

48.     Around the time of the equity event, Bloomfield told Pollack that he was concerned that Alvest was treating older employees, including Bloomfield, worse because of their age.  Bloomfield periodically expressed these concerns to Pollack and to Sage's then CFO and Head of HR throughout the remainder of his employment.

<u>Alvest Reduces Bloomfield's Compensation and Responsibilities</u>

<u>2018 Agreement</u>

49.     Despite Bloomfield's long-term success leading Sage, beginning in or around 2017, when Bloomfield was 62 and 63 years old, Alvest began marginalizing him and devaluing his work.

50.     In 2017, when Bloomfield was 62, Falconis informed Bloomfield that his next employment agreement (since his renewable contract would end in 2018) would include a significant decrease in compensation and term length.

51.     Specifically, Alvest would decrease Bloomfield's compensation from $340,000 to $200,000.

52.     During this conversation, Falconis admitted that he was considering Bloomfield's age in making decisions about Bloomfield's employment. Falconis told Bloomfield during the discussion that he wanted to hire a "replacement," and that he planned to "look for someone in his late 30s [or] early 40s" who could be the "guy of the future." Falconis described his ideal hire as someone who was "20 years younger than [Bloomfield]." Falconis explained that the Company could not pay Bloomfield more than $200,000 because the Company had to "invest in [a] new person" for the "future."

53.     Falconis also told Bloomfield around this time that the term of the agreement would be for one year, instead of the two-year terms the agreement had always had since Alvest's acquisition of Sage in 2008.

54.     Bloomfield objected to Falconis about the revised terms. He told Falconis that he would not sign the agreement at the dramatically reduced compensation.  Further, Bloomfield stated that he wanted the agreement to run for at least two years.

55.     According to Pollack, Falconis later complained to Pollack that Bloomfield had asked for the two-year term. On information and belief, Falconis wanted Bloomfield's employment to be subject to a shorter term because of his view that Bloomfield should retire soon based on his age.

56.     On or about May 14, 2018, Alvest sent a new employment agreement (the "2018 Agreement"). The 2018 Agreement presented slightly better terms than those that Falconis had threatened in 2017, but they still reflected a significant downgrade for Bloomfield. The new

11

agreement contained a two-year term. However, Alvest offered to pay Bloomfield an annual salary of $220,000, which was much less than his compensation had been since 2008.

57.    Additionally, the 2018 Agreement reduced Bloomfield's potential bonus from $75,000 to $50,000. Before the new agreement, Bloomfield had received bonuses at or above the $75,000 target. These bonuses were based on Bloomfield's individual performance and defendants' company-wide performance.

58.    After the 2018 Agreement, Bloomfield received less than $50,000 in annual bonuses.

59.    Bloomfield was unhappy with the reduction in compensation, but ultimately had no choice but to accept it if he wanted to continue with the business that he spent 20 years building. Accordingly, he signed the new agreement.

Reduction in Role and Responsibilities

60.    In addition to reducing Bloomfield's compensation and bonus potential, Alvest substantially diminished the scope of his work and assigned the responsibilities to younger and less experienced employees.

61.    In or around 2018 and 2019, Alvest took away some of Bloomfield's responsibilities, including sales and customer service, and reassigned them to another employee who was is in his late 30s or early 40s. Before joining Alvest, that employee's experience was mostly in over-the-road trucking equipment with no, or virtually no, airline or sales experience.

62.    The employee to whom Alvest assigned Bloomfield's responsibilities was unsuccessful in the sales role at Sage. Even after Alvest took away Bloomfield's sales responsibilities, Bloomfield continued to devote significant time to sales work to maintain defendants' customer relationships. Bloomfield's 2018 year-end performance review

12

1295917 v1

acknowledged the difficulties that the reassignment caused Alvest and Sage. Pollack in the review wrote that the transition "has not been easy . . . for the business." Pollack, however, commended Bloomfield on his handling of the transition, stating: "[Bloomfield] is straddling a fine line of trying to help, without assuming the leadership position or without undermining [the employee]'s position. …While there is always opportunity for improvement, the transition happened as planned and with as little issue as possible."

63. Around the same time, Alvest additionally removed some of Bloomfield's engineering, product management, and quality control duties and gave them to another Sage employee in his late 30s or early 40s.

64. Alvest never explained to Bloomfield its decision to reassign these responsibilities. Instead, the only information Bloomfield received was from Pollack, who told Bloomfield that Alvest was reassigning his responsibilities and that Falconis made the decision. Pollock further explained that the reassignment was part of Alvest's "transition" to younger management.

2020 Agreement

65. Alvest's treatment of Bloomfield only got worse over time.

66. In spring 2020, Alvest notified Bloomfield that it was extending his employment for only one year. This new employment agreement would expire June 30, 2021.

67. Around the same time, Alvest notified Bloomfield that it was reducing his scheduled hours by 40% as of June 30, 2020, and by 50% as of January 1, 2021.

68. Alvest further told Bloomfield it would slash his already-reduced salary consistent with the reductions to his schedule. Accordingly, from June 29, 2020, to January 1,

2021, Bloomfield's salary was $132,000 per year. From January 2021 until his firing in September 2021, Bloomfield's salary was $110,000 per year.

69.    On information and belief, defendants did not reduce the hours and salary of other employees at this time.

70.    In addition, on information and belief, Sage hired additional employees in 2020 and 2021, despite claiming that it reduced Bloomfield's pay for economic reasons.

71.    In addition to cutting Bloomfield's salary, Alvest also decreased his bonus potential and his vacation time as of June 2020.

72.    Further, Alvest demoted Bloomfield in or around June 2020. His title changed from Executive Vice President to Senior Advisor.

73.    During this time, Alvest continued to give away Bloomfield's responsibilities to his younger coworkers.

74.    Defendants never told Bloomfield that they cut his pay, reduced his responsibilities, or demoted him due to his performance as an employee.

## Alvest Fires Bloomfield

75.    On July 20, 2021, Alvest told Bloomfield that defendants were firing him effective September 30, 2021. Alvest later agreed to extend Bloomfield's end date to October 8, 2021, so he could organize, manage, and establish customer meetings at an industry trade show.

76.    On September 3, 2021, Bloomfield met with Maguin, Alvest's CEO, to discuss his dismissal, including the reason for firing Bloomfield and his post-employment non-competition obligations. During the meeting, the only explanation Maguin provided to Bloomfield for firing him was discriminatory.  Maguin told Bloomfield that Alvest wanted to transition and

14

1295917 v1

"build a team for the future." Bloomfield understood Maguin's explanation to be a reference to his age.

77.     During this meeting, Maguin also stated that Bloomfield "knew this was going to happen." This was not true.

78.     In explaining the decision, Maguin said nothing about Bloomfield's performance.

<u>Age Discrimination</u>

79.     Defendants reduced Bloomfield's responsibilities, pay, title, and ultimately, fired him because of his age.

80.     First, as stated above, Alvest executives repeatedly made comments demonstrating their age bias. Falconis explicitly told Bloomfield that he was looking to hire a replacement who was "20 years younger" than Bloomfield. Falconis and Maguin also frequently stated that they wanted to "transition" the Company's management to the "next generation" and to a "younger team." True to form, Maguin told Bloomfield that the Company was firing him to build a team "for the future."

81.     Second, consistent with these statements and as explained above, Alvest pushed aside several highly qualified managers in their 60s and replaced them with younger, less experienced employees.

82.     Third, as explained above, there are few older employees at the upper echelons of Alvest and Sage.

83.     Fourth, Maguin's statement that Bloomfield "knew this was going to happen" was false. Neither at the time that he became an Alvest employee nor anytime thereafter did Bloomfield discuss with Alvest that his employment was subject to a finite period. Further,

15

Alvest plainly did not hire Bloomfield as a short-term employee for the purposes of assisting with the transition after the acquisition. To the contrary, at the time of his firing, Bloomfield had worked for Alvest and continued to grow the Sage business for over 13 years.

84. Indeed, in Bloomfield's 2020 performance review, Pollack identified Bloomfield's long-term goals for the following year. Pollack wrote that those goals included "[c]ontinu[ing] to focus on the development and deployment of our marketing collateral" and to "support the needs of the business as requested for special projects." The review concluded, "[t]here are many areas where [Bloomfield] can add value. It will be our joint mission to identify these and to ensure that it is both rewarding for [Bloomfield] as well as for Sage." Neither that review nor any other document Bloomfield received from Alvest referred to Alvest's purported plan to end his employment. Bloomfield received this review in March 2021, only four months before Alvest fired him.

85. Also, Bloomfield had made clear that he did not have any impending intentions to retire and was not told prior to his firing that the Company intended to terminate his employment. For example, in September 2017, Bloomfield wrote to Pollack, "I am not considering a retirement in the next 5 or more years." Contrary to Maguin's suggestion that Bloomfield's firing was part of a long-standing and well-known plan, Pollack responded, also in September 2017, "I don't believe there was discussion about your departure."

86. Further, on information and belief, Bloomfield's firing cannot be justified by financial reasons. Even though COVID-19 adversely affected the airline industry, Alvest and Sage continued to hire younger employees throughout the pandemic. In addition, Bloomfield's decades of experience leading Sage included successfully navigating the business through multiple catastrophic events that hurt the airline industry, such as the 9/11 terrorist attacks, the outbreak of

1295917 v1

the SARS pandemic, and multiple financial crises. Indeed, at the beginning of the COVID-19 pandemic, employees expressed their concerns about the viability of the business. During this time, Sage's former CFO and Head of HR told employees not to worry because Pollack and Bloomfield have always steered Sage through other crises.

## Retaliation

87.     Unfortunately, the Company was not satisfied with merely firing Bloomfield because of his age. When Bloomfield dared to object to the discriminatory conduct, Alvest retaliated against Bloomfield by damaging his reputation within the industry and pushing him out of a key position.

88.     Since 2008, Bloomfield has been a part of the International Airport Equipment Manufacturers' Association ("IAEMA"), a trade organization. In March 2020, Bloomfield was named IAEMA's President and Chairperson.

89.     In or around Fall 2021, Bloomfield complained, through counsel, that defendants had discriminated against him because of his age.

90.     On April 26, 2022, Bloomfield filed a charge against defendants alleging age discrimination with the EEOC.

91.     Since then, Bloomfield has continued to make clear to defendants that he intended to pursue his employment discrimination claim.

92.     In Fall 2022, Bloomfield was pushed out of his President and Chairperson role in IAEMA. According to several other Board members with whom Bloomfield spoke, Alvest leadership, including Maguin, had pressured IAEMA to remove Bloomfield from his role.

1295917 v1

93.    On information and belief, defendants pushed out Bloomfield because he had engaged in protected activities, including complaining about discrimination through counsel and filing a charge with the EEOC.

FIRST CAUSE OF ACTION
ADEA: Age Discrimination

94.    Plaintiff repeats and realleges paragraphs 1 through 93 as if fully set forth herein.

95.    By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment because of his age in violation of the ADEA.

96.    Defendants knew that their actions constituted unlawful discrimination and/or acted with malice or reckless disregard for plaintiff's statutorily protected rights.  These violations were willful within the meaning of the ADEA.

97.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and mental anguish, humiliation and damage to reputation, as a result of defendants' discriminatory practices unless and until this Court grants relief.

SECOND CAUSE OF ACTION
ADEA: Retaliation

98.    Plaintiff repeats and realleges paragraphs 1 through 97 as if fully set forth herein.

99.    By the acts and practices described above, defendants retaliated against plaintiff for making protected discrimination complaints, including about defendants' mistreatment of him and others based on age, in violation of the ADEA.

18

100.    Defendants acted with malice and/or reckless indifference to plaintiff's rights protected under federal law. These violations were willful within the meaning of the ADEA.

101.    As a result of defendants' retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

THIRD CAUSE OF ACTION
State Law: Age Discrimination

102.    Plaintiff repeats and realleges paragraphs 1 through 101 as if fully set forth herein.

103.    By the acts and practices described above, defendants, in violation of the State Law, discriminated against plaintiff because of his age.

104.    Defendant Sage is liable under the State Law as plaintiff's employer.

105.    Defendant Alvest SAS is liable under the State Law as plaintiff's employer and/or as an aider and abettor of the discrimination against plaintiff.

106.    Defendant Alvest USA is liable under the State Law as plaintiff's employer and/or as an aider and abettor of the discrimination against plaintiff.

107.    Defendants acted with malice and/or reckless indifference to plaintiff's rights protected under the State Law.

108.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

1295917 v1

## FOURTH CAUSE OF ACTION
State Law: Retaliation

109.     Plaintiff repeats and realleges paragraphs 1 through 108 as if fully set forth herein.

110.     By the acts and practices described above, defendants, in violation of the State Law, retaliated against plaintiff because he objected to defendants' discriminatory conduct.

111.     Defendant Sage is liable under the State Law as plaintiff's employer.

112.     Defendant Alvest SAS is liable under the State Law as plaintiff's employer and/or as an aider and abettor of the retaliation against plaintiff.

113.     Defendant Alvest USA is liable under the State Law as plaintiff's employer and/or as an aider and abettor of the retaliation against plaintiff.

114.     Defendants acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

115.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a)     declaring the acts and practices complained of herein to be violations of the ADEA and the State Law;

(b)     enjoining and permanently restraining these violations of the ADEA and the State Law;

1295917 v1

(c)     directing defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)     directing defendants to place plaintiff in the position he would have occupied but for defendants' unlawful treatment of him, and making him whole for all earnings and other benefits he would have received but for defendants' discriminatory treatment, including but not limited to wages, including back pay and front pay, bonuses, and other lost benefits;

(e)     directing defendants to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, pain and suffering, and injury to professional standing and reputation;

(f)     directing defendants to pay liquidated damages for their violations of the ADEA;

(g)     directing defendants to pay plaintiff additional amounts as punitive damages;

(g)     awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

(h)     awarding plaintiff the costs of this action, together with reasonable attorneys' fees; and

(i)     awarding such other and further relief as this Court deems necessary and proper.

1295917 v1

<u>DEMAND FOR A TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.


Dated: New York, New York
July 5, 2023


VLADECK, RASKIN & CLARK, P.C.

By:  _____/s/_____
Jeremiah Iadevaia
Emily Bass
Attorneys for Plaintiff
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300

22

1295917 v1